25 C.C.P.A.(Patents)

## KREIDEL v. PARKER.
### Patent Appeal No. 3962.

Court of Customs and Patent Appeals.
June 6, 1938.

Edwin R. Hutchinson, of Washington, D. C. (Cooper, Kerr & Dunham and H. Frank Wiegand, all of New York City, of counsel), for appellant.

Mason & Porter, of Washington, D. C. (Eugene G. Mason and Charles L. Sturtevant, all of Washington, D. C., of counsel), for appellee.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges.

LENROOT, Associate Judge.

This is an interference proceeding wherein the Board of Appeals of the United States Patent Office reversed a decision of the Examiner of Interferences which awarded priority of invention of the subject matter of the interference to appellant.

The interference arises between an application for patent filed by appellant on October 25, 1933, and an application filed by appellee on November 6, 1934. Appellant is therefore the senior party, and the burden was upon appellee to establish priority of invention by a preponderance of evidence.

The issue embraces one count, which reads as follows:

"A tube coupling comprising a body having means for attachment to a part to which a tube is to be connected, said body having a shoulder formed therein as an abutment for the end of a tube and having a flaring mouth leading to said shoulder, a sleeve having an annular part with an edge sufficiently hard to cut into the tube, and means to force said sleeve into said flaring mouth and longitudinally of the tube thereby to contract said annular part and cause said edge to shear the outer surface of the tube and form a ridge of appreciable size thereon without appreciably deforming the internal surface of the tube."

Said count originated in appellant's application and was suggested to appellee by the Primary Examiner. Appellee copied the same for the purposes of interference.

The invention is concisely described in appellee's brief as follows:

"The count defines the invention as residing in a tube coupling *per se*. The tube

coupling consists of three parts;—a body, a gripping sleeve and a cap nut having threaded connection with the body portion. The body portion is defined as having a *shoulder* formed as an abutment for the end of the tube and a *flaring mouth* leading to said shoulder. The gripping sleeve is defined as having an annular part with an edge sufficiently hard to cut into the tube. The cap nut is defined as a means for forcing the sleeve into the flaring mouth and longitudinally of the tube so as to cause the annular part of the sleeve to contract and shear the outer surface of the tube to form a ridge of appreciable size *without appreciably deforming* the internal surface of the tube."

The interference was declared as of April 29, 1935.

Appellant in his preliminary statement alleged conception of the invention "on or about August ——, 1931," disclosure to others "on or about October, 1931," and reduction to practice in Germany on November 30, 1932; that said invention was first introduced into the United States on or about October 25, 1933, and that a patent for said invention was applied for by appellant in Germany on November 26, 1932; that applications for patent for said invention were applied for in Great Britain on May 16, 1933, and in other countries at subsequent dates.

On December 14, 1935, appellant gave notice that he would rely upon the filing of his German application on November 28, 1932, as a constructive reduction to practice of the invention. Said application appears in the record and is dated November 28, 1932.

Appellee in his preliminary statement alleged conception and disclosure to others on or about the 1st day of July, 1926; with respect to reduction to practice the statement alleged:

"* * * that he first embodied his invention in a full-size device which was completed on or about the 1st day of July, 1926, and that the device was successfully used in the laboratories of The Parker Appliance Company, at Cleveland, Ohio; that several other couplings embodying the subject-matter of the count of the Interference were made on or about September 1, 1934; that he has never put the coupling into production and sold the same publicly; that he began to be active in adapting and perfecting the invention on or about the 1st day of July, 1926."

It will be observed that no date is alleged by appellee for reduction to practice of the invention. However, inasmuch as appellant's reasons for appeal assign no error in not confining appellee's reduction to practice to the filing date of his application, it is unnecessary for us to consider the question of whether appellee, under his preliminary statement, should have been confined to the filing date of his application for conception and reduction to practice.

Appellant took no testimony, but relied upon his United States application, and also, for conception and reduction to practice, relied upon the date of his German application, November 28, 1932.

Appellee took testimony to establish priority of invention, and contended that the evidence showed a reduction to practice in 1926 and a second reduction to practice in 1932 or early in 1933.

Both the Examiner of Interferences and the Board of Appeals held that appellee had not established reduction to practice of the invention in 1926, and before us appellee stated that he accepted these concurring decisions of the Patent Office tribunals and would rely upon reduction to practice of the invention in 1932 or early in 1933.

Both the Examiner of Interferences and the Board of Appeals held that appellant was restricted to the filing date of his United States application, October 25, 1933, for conception and constructive reduction to practice of the invention.

The Examiner of Interferences further held that appellee's Exhibits 2 and 3, upon which he relies for reduction to practice, do not support the count in that the internal surface of the tube in each of the exhibits is "appreciably" deformed; said examiner also held that it had not been satisfactorily established that said Exhibits 2 and 3 were made prior to November, 1933, and that, assuming that they were made prior to said time, the evidence did not establish that said exhibits were sufficiently tested to constitute a reduction to practice. He therefore awarded priority of invention to appellant.

The Board of Appeals agreed with the Examiner of Interferences that appellant was not entitled to the date of the filing of his German application for conception and reduction to practice of the invention, but held that appellee's Exhibits 2 and 3 support the count, that they were suc-

cessfully tested prior to any date that can be accorded to appellant, and therefore reversed the decision of the Examiner of Interferences and awarded priority of invention to appellee. From such decision this appeal was taken.

We will first consider appellant's contention that he is entitled to the date of his German application for conception and reduction to practice of the invention.

It will be observed that the count calls for a "body having a shoulder formed therein as an abutment for the end of a tube and having a flaring mouth leading to said shoulder." Both of the Patent Office tribunals held that appellant's German application did not disclose a shoulder as required by the count.

Upon this point the Board of Appeals in its decision stated:

"In the German application referred to, the conically tapered portion of one coupling element by which constriction of the cutting sleeve is effected is continuous from end to end. A portion of this tapered surface may be utilized to prevent longitudinal movement of a tube with which the coupling is used but we agree with the Examiner of Interferences that a construction of this sort does not fairly satisfy the limitation in question, especially as the domestic application clearly shows a construction which does satisfy it."

The Examiner of Interferences upon the same point stated:

"It is not believed that the count, as thus construed, is readable on Kreidel's German application. The shoulder, which is a vital element, is recited as distinct from the flaring mouth. In attempting to read the count on the German application, it is not possible, until the tube is inserted, to tell where the shoulder ends and the flaring mouth begins. It is thought that the count requires that the shoulder and mouth be distinct parts and not arbitrary divisions of a single element. Kreidel will accordingly be restricted to his date of filing in this country—October 25, 1933."

We are in accord with the view of the Examiner of Interferences that the count requires that the shoulder and flaring mouth be distinct parts, and not arbitrary divisions of a single element.

 While it is true that the count should receive the broadest interpretation that its terms will reasonably permit, we are of the opinion that we would not be warranted in holding that a part of the flaring mouth of the device disclosed in the German application constituted a shoulder as required by the count.

As hereinbefore noted, the filing date of appellant's United States application is October 25, 1933. Therefore, in view of the above holding, if appellee conceived and reduced to practice the invention prior to said date, or if he conceived prior thereto and was diligent from immediately prior to October 25, 1933, until he reduced to practice, the Board of Appeals did not err in awarding priority of invention to appellee.

As hereinbefore observed, the Examiner of Interferences held that appellee had not established that said Exhibits 2 and 3 were made prior to appellant's United States filing date; or, if made prior to said date, it did not appear that, assuming that they support the count, they had been sufficiently tested to constitute a reduction to practice. He further held that said exhibits do not support the count by reason of a ridge formed upon the inner surface of the tube.

Upon this branch of the case we will first consider whether said exhibits support the count. Each of the exhibits shows a deformation upon the inner surface of the tube, discernible to the eye.

Upon this point the Examiner of Interferences stated:

"Finally, it is not believed that exhibits 2 and 3 support the count, which calls for the formation of a ridge of 'appreciable size' without 'appreciably deforming the internal surface of the tube.' In accordance with the usual meaning, an appreciable change is one which can be detected by the senses and such a change has obviously been made in the inner surface of the tube of each of these exhibits. Further, while the sleeve has cut into the tube to a rather large extent, the actual ridge formed above the surface of the tube is very slight. Accordingly, if this ridge is appreciable, that term must include very small amounts and is thus applicable to the deformation of the inner surface. * * *"

The Board of Appeals expressed the view that the Examiner of Interferences had given too narrow a construction to the word "appreciably' in the count, and held that said exhibits 2 and 3 support the count.

It appears to us that, in construing the terms "appreciable" and "appreciably" as used in the count, consideration must be given to the connection in which such terms are used. The Examiner of Interferences held that if the ridge produced on these exhibits is appreciable, "that term must include very small amounts and is thus applicable to the deformation of the inner surface." We are not in agreement with this view of the Examiner of Interferences. In appellant's brief the purpose of the ridge upon the outside of the tube called for by the count is described as follows:

"* * * The ridge serves as a continuous annular barb (somewhat like a ring of fish hooks) to prevent undesired withdrawal of the tube from the body portion. * * *"

With respect to the absence of deformation upon the inner surface of the tube, appellant's written specification does not mention this feature. However, his drawings do not show any such deformation, although one of the drawings of his German application does show slight deformation of the inner surface of the pipe, as do appellee's Exhibits 2 and 3.

This is significant only because the language of appellant's United States application, describing the means by which the ridge on the outside of the tube is formed, is practically identical with the language of his German application upon that point. It would therefore seem that if the device disclosed in appellant's German application produces some deformation upon the inner surface of the tube, the same device disclosed in his United States application would also produce such deformation. However, this is important only in determining the meaning of the word "appreciably", as used in the count. We think both appellant and appellee had in mind that their respective devices would not produce such deformation upon the inner surface of the tube as to appreciably restrict the flow of liquid or gas therethrough.

In this view the word "appreciable," as applied to the ridge upon the outer surface of the tube, should be given a much more restricted construction than the word "appreciably" as applied to deformations upon the inner surface of the tube. A very small ridge thrown up by the cutting or shearing operation of the sleeve would prevent longitudinal movement of the tube, while a like deformation upon the inner surface of the tube would not, except in a very minor degree, affect the flow of liquid or gas through the tube.

We are therefore in accord with the view of the Board of Appeals that Exhibits 2 and 3 support the involved count.

We now come to a consideration of appellee's evidence respecting conception and reduction to practice of the involved invention. Both Patent Office tribunals held that a certain drawing, appellee's Exhibit 4, dated January 19, 1933, disclosing the invention, was made on said date; that it was disclosed to others on said date, and that appellee is entitled to said date for conception of the invention. As hereinbefore stated, the Examiner of Interferences held that appellee's proofs did not establish actual reduction to practice of the invention prior to the filing date of his application. He further held that appellee was not diligent in reducing it to practice from immediately prior to appellant's filing date, October 25, 1933, to appellee's filing date, November 6, 1934.

While, before the Patent Office tribunals, appellee contended that his evidence established conception and reduction to practice of the invention in 1926, both tribunals held to the contrary, and, as hereinbefore noted, appellee in this appeal accepts such finding and here makes no contention of conception and reduction to practice prior to the latter part of 1932.

Appellee, doing business under the name of the Parker Appliance Company, for many years has been engaged in the manufacture and sale of tube couplings, valves, and other associated products at Cleveland, Ohio. He testified that he conceived the involved invention in 1926 and embodied the same in a full-sized device, it being used upon a compressor in his establishment. The device so used was introduced in evidence as Exhibit 1.

Both tribunals of the Patent Office held that, assuming that said Exhibit 1 supported the count, there was not sufficient evidence to establish successful reduction to practice of the invention based upon said Exhibit 1.

Appellee further testified that he anticipated that there would be a basic objection to a coupling of the character here involved, having the ordinary steel sleeve, because of the corrosion problem, but that, with the advent of the use of stainless steel in his plant, he late in 1932 revived

his interest in a steel sleeve coupling. He stated:

"* * * Along in 1932 or about 1932, late, we revived our interest in a steel sleeve coupling* of this general character and built numerous different couplings and worked on the idea of stamping out the sleeve from tubing which necessitated a considerable investment in dies, as well as locating a suitable source for stainless steel tubing of relatively thin wall, that is, within the ordinary proportions of the tubing we used, and also with a special outside diameter. The production difficulties there required quite a bit of time to analyze. We built quite an extensive number of samples of couplings with stainless steel sleeves of the cutting edge really founded on this same basic principle." (Italics ours.)

Appellee further stated that it was his usual practice to test couplings on assembly. He further testified:

"Q. 41. Can you produce any of these couplings to which you have just referred to with the stainless steel sleeve? A. Yes, sir. There is two couplings of that style.

"Q. 42. About when, Mr. Parker, did you start in making these couplings with the stainless steel sleeve? A. As near as I can determine along late in 1932, early '33, we spent considerable time on numerous styles, sizes and samples.

"* * * We have a hydrostatic pump capable of pressures up to more than 10,000 pounds. We usually test couplings of that type to destruction, that is, run the pressure to a high degree frequently, even blow them off, or break the tube, to determine their ability to withstand high pressure and then after testing, pressure testing, there are nearly always sample sections, in this manner, so that we can see just what takes place in any coupling, what the internal factors are. By observing a section of this kind you can readily see just how the metal acts under pressure and what the character of the joint may be.

"Q. 44. State whether or not, Mr. Parker, you followed your usual procedure with these couplings, tested them? A. Yes, sir; they were tested in the usual manner.

"Q. 45. Were they successful? A. Very satisfactory. * * *

"Q. 46. Was any drawing made on this particular coupling with the stainless steel which you have produced? A. Was there any what?

"Q. 47. Was there any drawing made of it? A. Yes; there was a drawing made at the time.

"Q. 48. Can you produce the drawing? A. Yes; I have the drawing that was made for the purpose of a patent application.

"Q. 49. Was this drawing made under your direction? A. Yes, sir.

"Q. 50. By whom? A. By L. H. Schmohl.

"Q. 51. He is a draftsman regularly employed by you for that purpose? A. Yes, sir.

"Q. 52. Does he do something more than drafting work? A. He frequently follows up new jobs and watches the test work and reports to me, when I am too busy to get out and see the results of the tests.

"Q. 53. He is with you now, is he? A. Yes, sir.

"Q. 54. Who had charge of the manufacturing work at the time when these two couplings, which you have just produced, were made? A. Mr. Birtch.

"Q. 55. Do you know who made these couplings? A. I believe that Martin Binder made them. * * *

"Q. 56. Mr. Parker, what are your instructions to your draftsman about dating drawings, anything?

"Mr. Wupper: I object to the question as irrelevant and immaterial.

"A. We have a fixed practice for a very considerable time past of dating our drawings so that it indicates the date when the drawing was made. Our numerical system indicates the day of the month and the year and the sequence of drawings for that particular day identify the time when drawings are made.

"Q. 57. Were these two couplings you produced made prior to the making of this drawing, do you know? A. Yes.

"Q. 58. Has this coupling with the stainless steel sleeve been put out commercially by you? A. No, sir.

"Q. 59. Have you made quite a number of developments, Mr. Parker, for which you have taken out patents? A. Yes, sir; I have numerous patents. It is our policy to carry on continual development work.

"Q. 60. And to cover it by patent when there is novelty included, as a rule? A. As soon as we can schedule the patent work

*and prepare the information for the attorney, patents are applied for."* (Italics ours.)

The couplings testified to were introduced in evidence as Exhibits 2 and 3, and the drawing referred to was introduced in evidence as Exhibit 4.

Exhibit 4 contains five figures, numbered 1 to 5, inclusive, and three figures not numbered. Figure 4 of the drawing does not support the count before us. At the bottom of the drawing there is certain data. Under the head of "Compression Fittings" are the initials L. H. S., and under the abbreviations (Pat. Drg) appear the figures 1–19–33. Also in the lower right hand corner appear, opposite the abbreviations "Drg. No." the figures 1–1933–5, and in the upper left hand·corner are the figures 1–1933–5.

Figures 1 and 2 of said Exhibit 4 conform quite closely to the drawings of appellee's application, but differ in some respects from Exhibits 2 and 3. These differences will be hereinafter discussed.

Appellee further testified, upon cross-examination, as follows:

"Q. 102. Now, throughout this period from 1926 to date you knew there was a demand for a low priced coupling in which it wouldn't be necessary to flare the end of the tube, did you not? A. Yes, sir."

H. E. Birtch, a witness on behalf of appellee, testified that he was superintendent of appellee's plant; that Exhibits 2 and 3 were made, as nearly as the witness could recall, in 1930. He further testified as follows, referring to Exhibits 2 and 3:

"Q. 225. Do you know who made these couplings? A. Yes; a man by the name of Binder made some of them and we had two or three lathe hands there at the time that are not with us any more that probably worked on some of the parts. *We made several of them and at different times."* (Italics ours.)

"Q. 228. Do you know whether or not these couplings that you have just referred to, Parker Exhibits Nos. 2 and 3, were completed and tested? A. Oh, yes, sir.

"Q. 229. Were they successful? A. Yes, sir.

"Mr. Wupper: That is objected to as a conclusion.

"Q. 230. When do you usually cut the coupling through to show what the condition is? A. After our tests are completed."

Upon cross-examination the witness testified:

"Q. 233. Now, you said that your Parker Exhibit Nos. 2 and 3 were made within a month prior to the drawing I show you. A. I didn't say that. I said they were made, as near as I can recollect, several months prior to any drawings being made, to my knowledge.

"Q. 234. *Is this the drawing to which you refer, showing the witness Parker Exhibit No. 4?* A. *No, sir.* (Italics ours.)

"Q. 235. If Mr. Parker has testified, as I believe he has, that Parker Exhibits Nos. 2 and 3 were made the latter part of 1932 or the early part of 1933, would you say that he was entirely mistaken? A. No; I wouldn't. No.

"Q. 236. They may have been made in the early part of 1933, as far as you can state? A. That is possible."

The witness Schmohl was a draftsman employed by appellee. He testified that he made the drawing, Exhibit 4, on January 19, 1933; that the initials upon the drawing are his. He further testified as follows:

"Q. 248. Then you made this drawing, I understand, and completed it on January 19th, 1933? A. That's right.

"Q. 249. What did you have to make the drawing from? A. We had a sample coupler.

"Q. 250. I call your attention to Parker Exhibits Nos. 2 and 3 and ask you if you recognize either one. of these couplings? A. Yes; I do.

"Q. 251. What do you recall about them? A. They were couplings we made the drawings from, samples we made in the shop.

"Q. 252. Did you see couplings of this kind being tested? A. No; I can't say as I saw them tested. I saw them right after they were tested and I had them to make the drawings from.

"Q. 253. Who turned the couplings over to you to make the drawing? A. Mr. Parker.

"Q. 254. Was this drawing made for any particular purpose? A. Well, it is made for a patent drawing.

"Q. 255. And you had couplings, did you, from which you made these drawings? A. I did.

"Q. 256. They were completed couplings? A. Yes, sir.

"Q. 257. Cut through like these samples we have here? A. Yes, sir.

"Q. 258. Do you think it is one of these samples? A. It was one of the samples; yes, sir.

"Q. 259. That is one of these Parker exhibits, either No. 2 or No. 3? A. No. 2 or No. 3; yes, sir."

Upon cross-examination the witness testified as follows:

"Q. 265. Is there any way you can positively identify these two samples, Parker Exhibits Nos. 2 and 3, as the identical samples from which you made the drawing, Parker Exhibit No. 4? A. Well, I know they are samples we made up. I don't know whether there is any real, possible means of stating definitely, but I know they are samples I used in making the drawings.

"Q. 266. But you can't identify them as being the exact, particular samples which you had before you at the time you made this drawing, Parker Exhibit No. 4? You couldn't swear to that? A. Well, sure. I am sure of it. Yes, I can swear to it, that I had those samples. *It is really hard to say.* (Italics ours.)

"Q. 267. Are there any marks on these samples? A. No; there are no marks.

"Q. 268. Referring to Parker Exhibits Nos. 2 and 3 by which you can identify them? A. No identification, except they are the samples we used.

"Q. 269. These are similar to them; is that correct? A. I don't know. There is the samples I used.

"Q. 270. Now, did you have a sample of the construction illustrated in Figure 4 of this drawing, Parker Exhibit No. 4? A. I believe there was such a sample.

"Q. 271. What happened to that? A. Maybe that was—no: that was just another application of this same principle we had in that.

"Q. 272. Are you sure you didn't make a sample of that? A. No; there was no sample made.

"Q. 273. You are positive there wasn't any sample made? A. There are applications of that same principle.

\* \* \* \* \* \*

"Q. 275. Now, in these samples, Parker Exhibits Nos. 2 and 3, the shoulder formed in the body and against which the ends of the tubes abut, these shoulders are not made in accordance with the drawing, of course, are they? A. In just what point do you mean?

"Q. 276. The shoulder against which the ends of the tube abut, they do not correspond with the showing of the shoulders in the drawing, Parker Exhibit No. 4, do they? A. No; they do not.

"Q. 277. Well, then, these drawings were not exactly copied from the samples, Parker Exhibits Nos. 2 and 3, were they? A. Yes. This shoulder, here, this was merely added there for extra precaution on the drawing after we had made the samples.

"Q. 278. Was that your idea to have the undercut shoulder? A. No. I believe it was Mr. Parker's idea."

We would observe that, while the witness stated that the modification of the drawing from Exhibits 2 and 3 was made according to appellee's idea, appellee gave no testimony upon that subject.

Martin Binder, a witness for appellee, testified that he made Exhibits 2 and 3, but was unable to recall when they were made. Upon this point he testified:

"Q. 326. Did you usually test the coupling after you made it, or did you turn it over to somebody else? A. I don't exactly test them. I make it up and give it to—turn it in to the superintendent, or whoever is over me, and he takes it in to Parker and then when Parker comes out he says—well, he comes out again and 'Now,' he says, 'test that.' Generally the foreman and I we test them things together, or the superintendent, whoever is there at that time.

"Q. 327. Were these samples like Parker Exhibits Nos. 2 and 3 tested out? A. Yes.

"Q. 328. Were they all right? A. Yes.

"Mr. Wupper: The question is objected to."

"Q. 329. You put them under considerable air pressure? A. About 35 to 50 pounds; that is what we tried them out at.

"Q. 330. You have no way of fixing the date when you made these, have you? A. No. You see, I worked on many things; every day something new and different, so many kinds, I couldn't tell the date."

It appears from the record that appellee had secured a large number of patents upon

various inventions. With reference to certain of these patents appellee testified as follows:

"Q. 84. Now, Patents Nos. 1,982,533, 1,977,241, 1,977,240, 1,894,700 1,893,442 1,893,441 and 1,835,179 were all for tube couplings for the same general purpose as those exemplified in Parker Exhibits Nos. 1, 2 and 3; is that correct? A. Except that those series of patents were couplings of the type for the more exacting services in which field, we are more active than in the other division of less costly couplings and more moderate service and with the possible exception of No. 1,894,700 which is of a basically different type.

"Q. 85. All of these couplings shown in the patents which I enumerated in the last preceding question could have been used in place of the coupling embodied in Parker Exhibit No. 1; could they not? A. Yes, sir."

It appears that patents Nos. 1,977,240 and 1,977,241 were issued to appellee on October 16, 1934, upon applications filed April 29, 1933.

Upon his cross examination appellee testified as follows:

"Q. 73. When did you request your patent attorney to prepare an application upon this invention as shown in your drawing, Parker Exhibit No. 4? A. I don't recall that exact date. It was shortly after the preparing of this patent, I believe, or this drawing, rather; shortly after the preparation of this drawing."

Appellee also testified that on September 11, 1934, he instructed his patent attorney to prepare the application involved in this interference. He further testified as follows:

"Q. 92. What was it that caused you on September 11th, 1934, to request your patent attorneys to prepare the patent application involved in this interference? A. No special reason, only it had been in the file for action as soon as I thought best to release it. I hold the file developments to release for patent work and, as rapidly as I can see my way to release them to go through the patent work I do it."

It will be observed that, although appellee testified that he requested his patent attorney to prepare a patent application based upon Exhibit 4 shortly after the date the drawing bears, it was in fact more than 19 months after the date of said

drawing that such request was made. Moreover, appellee testified upon his direct examination that it was his policy, when he had made a useful invention, to cause an application for patent to be filed as soon as the patent work could be scheduled and information prepared for the attorney. Appellee gave no reason for his departure from his usual policy in the instant case, and gave no reason why the application was not earlier prepared if the invention had been in fact reduced to practice prior to January 19, 1933.

Of course, if the invention had been reduced to practice, there was no duty of diligence resting upon appellee in filing his application, and we refer to the time of filing, in connection with appellee's testimony, only as a circumstance bearing upon the question of whether Exhibits 2 and 3 were made and tested prior to appellant's filing date.

Another circumstance which seems to us significant is that appellee in his preliminary statement alleged that he embodied his invention in a full-sized device which was completed on or about the first day of July, 1926, and that several other couplings embodying the invention were made on or about September 1, 1934. He also alleged that he made drawings of the invention on or about January 19, 1933. This allegation no doubt refers to Exhibit 4 in evidence. It appears strange to us that if Exhibits 2 and 3 were made and tested shortly before January 19, 1933, the date of said drawing, appellee would not have remembered that fact and alleged it in his preliminary statement. If, on the other hand, said exhibits were made and tested in 1934, shortly before he instructed his patent attorney to prepare an application for patent, this would be in accord with appellee's preliminary statement. Appellee in his testimony made no reference to making any of the devices in 1934. Appellee's counsel states that, of course, it would have availed appellee nothing to have proved a construction and testing of the devices in 1934, which would be after appellant's constructive reduction to practice on October 25, 1933. Nevertheless, it seems strange that appellee should have remembered, at the time his testimony was taken, making devices embodying the invention in 1926 and in 1933, and yet at the time of making his preliminary statement he apparently failed to remember making the devices in either 1932 or 1933.

It is also a significant circumstance that if the drawing, Exhibit 4, was made from Exhibit 2 or Exhibit 3 for the purpose of filing a patent application, neither of said Exhibits 2 and 3 was marked in any way so that it could be subsequently identified. The evidence indicates that many couplings embodying the involved invention were made at different times, and we find no satisfactory evidence in the record identifying Exhibits 2 and 3 as couplings that were made and tested prior to October 25, 1933.

The only positive evidence upon this point is to the effect that the drawing, Exhibit 4, was made from Exhibit 2 or Exhibit 3, but we are not satisfied that this is a fact. The draftsman Schmohl, after testifying positively upon cross examination that Exhibit 4 was made from either Exhibit 2 or Exhibit 3, concluded his answer by stating that "It is really hard to say." He also admitted that the drawing was not exactly copied from either of said exhibits in that a certain shoulder appears in the drawing that is absent from said exhibits. This shoulder, the witness thought, was placed upon the drawing at the suggestion of appellee, but appellee did not so state.

The witness Schmohl also testified that Figure 4 of the drawing, Exhibit 4, was not made from any coupling before him.

The witness Binder testified that he made Exhibits 2 and 3, but had no recollection respecting when they were made.

Appellee was a prolific inventor, and we are unable to understand why, if events occurred in the order and at the times that he claims, no record was made of them other than the drawing Exhibit 4, and why he should not have included in his preliminary statement his claimed reduction to practice of the invention in 1932 or 1933. Nor are we able to understand why in said statement he should have alleged that he made couplings embodying the invention in 1934, but did not allege that he made such couplings in 1932 or 1933.

We do not intimate that either appellee or any of his witnesses testified falsely, intentionally or otherwise, in the case, but the burden of proof was upon appellee to establish priority of invention, and we agree with the Examiner of Interferences that the evidence does not satisfactorily establish such priority, for there are too many circumstances indicating that appellee and his witnesses may have been mis-taken in their recollection of important dates, and the sequence of events with respect to the making of Exhibits 2 and 3 and said drawing, Exhibit 4.

Had the Patent Office tribunals concurred in finding that appellee had reduced the invention to practice prior to October 25, 1933, we might not hold that they were manifestly wrong in so holding; but such tribunals did not agree upon this point, and it is our duty in those circumstances to exercise our independent judgment as to the weight of the evidence upon this issue.

Both tribunals held that appellee was the first to conceive the invention, but the Examiner of Interferences held that there was lack of diligence on the part of appellee in reducing the invention to practice. This is clearly true, for there is no evidence establishing diligence by appellee in reducing the invention to practice between just prior to October 25, 1933, appellant's filing date, and appellee's constructive reduction to practice on November 6, 1934.

For the reasons hereinbefore given, we are of the opinion that the decision of the Examiner of Interferences awarding priority of invention to appellant should have been affirmed, and the decision of the Board of Appeals is reversed.

Reversed.